**2021 WI APP 2**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2019AP194-CR

† Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**THOMAS A. NELSON,**

**DEFENDANT-APPELLANT.†**

---

| | |
|---|---|
| Opinion Filed: | December 9, 2020 |
| Submitted on Briefs: | December 20, 2019 |

---

| | |
|---|---|
| JUDGES: | Gundrum, J. |
| Concurred: | Davis, J. |
| Dissented: | Reilly, P.J. |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven W. Zaleski* of *Zaleski Law Firm*, Madison. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Anne C. Murphy*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

December 9, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2019AP194-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017CF101

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

THOMAS A. NELSON,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Racine County: FAYE M. FLANCHER, Judge. *Affirmed*.

Before Reilly, P.J., Gundrum and Davis, JJ.

¶1 GUNDRUM, J.   Thomas A. Nelson appeals a judgment of conviction for second-degree sexual assault, false imprisonment, and four counts of felony bail jumping.  He claims his constitutional Confrontation Clause right was violated at trial by the State's use of nurse practitioner Rita Kadamian's report of her

examination of the victim without Kadamian herself testifying. Nelson made no objection to this use during the trial, but now claims it was "plain error." Nelson also contends the prosecutor committed misconduct during her closing argument and the court failed to take sufficient steps to address it, resulting in a denial of due process and plain error. Nelson fails to convince us that any errors occurred, but even if there were errors, they were not "plain errors," and they were harmless.

## *Background*

<u>Use of Kadamian's report</u>

¶2 The State charged thirty-year-old Nelson with nine felony counts, including second-degree sexual assault, strangulation, and false imprisonment, in connection with his violent assault of seventeen-year-old J.T.[1] on January 21, 2017. Nelson initially denied having sexual contact with J.T., but following the return of incriminating DNA testing, he took the position at trial that he did have sex with her but that it was consensual "rough" sex. The following relevant evidence was presented at trial.

¶3 Hours after the assault, J.T. was examined by Gillian Lackey, a Sexual Assault Nurse Examiner (SANE) at Wheaton Franciscan Hospital in Racine. Lackey testified that during a SANE examination, she "listen[s] to the history of the assault," conducts "a physical assessment for any kind of illness or injury," and then collects evidence. The "biggest difference" between a SANE examination and "just a physical that you would give somebody," Lackey stated, is that during a SANE examination, "we actually collect evidence, DNA." When Lackey listens to an alleged victim's "history of the assault," there is a "victim[']s advocate" present and

---

[1] We use fictitious initials to aid in protecting the identity of the victim.

"usually … a police officer … as well." In this case, an advocate and a detective were present when J.T. provided Lackey the history of the assault by Nelson.

¶4 Because there was concern about the possible involvement of drugs or alcohol in connection with the assault, Lackey procured a sample of J.T.'s urine and blood for testing. Lackey then prepared her "specialty forensic exam room" and set up an evidence collection kit from the Department of Justice "based on what [J.T.'s] history of [the] assault was and where [Lackey felt] the most evidence and DNA c[ould] be collected off of her body."

¶5 During a SANE examination, if the alleged victim is wearing the same clothing as during the assault, as J.T. was, Lackey collects the clothing. She lays out a sheet with paper pads that the alleged victim stands on, and he or she then removes his or her clothing. The alleged victim puts on a gown, and Lackey places the sheet and clothing into a bag that she seals. Lackey followed this procedure with J.T., and on the witness stand, Lackey identified the various articles of clothing she collected from J.T.

¶6 Consistent with standard procedure, Lackey next performed and documented a "head to toe" assessment of J.T. Lackey noted and photographed "red marks" on J.T.'s ears and left cheek, "markings" on her inner thigh, and bruising on her breasts and left arm. The State showed the photographs to the jury, and Lackey testified that the injuries to J.T.'s arm and thigh were consistent with J.T.'s report that Nelson had bit her in those areas during the assault. After the head-to-toe assessment, Lackey collected evidence from J.T.'s mouth, hands, arm, breasts, thigh, and neck, collecting the latter because J.T. had indicated that Nelson had "placed his hands around her neck" during the assault.

¶7     Lackey next examined, photographed, and collected evidence from J.T.'s vaginal area. She observed injury to J.T.'s vagina, but because it was "very swollen," J.T. was "extremely uncomfortable," and she was bleeding due to her menstrual cycle, Lackey was not certain if the injury was a tear or an abrasion. When asked if J.T. had "any injury to her hymen," Lackey responded, "[n]ot that I was able to see." Lackey did observe "swelling and inflammation" on J.T.'s labia majora and what "look[ed] like an abrasion" on her labia minora.

¶8     Lackey explained that the evidence she collects during a SANE examination is sealed in an "evidence collection box" that is "handed off to a police officer" and ultimately "goes to the crime lab." Lackey testified that she also collected evidence from Nelson and that Nelson and J.T. were kept in separate rooms "to avoid any kind of cross contamination."

¶9     Through cross-examination and redirect examination, Lackey agreed that "part of [her] job is to collect evidence for criminal prosecution purposes." She acknowledged that while she observed J.T.'s injuries, she did not "personally … know how they got there," and it was possible they "could have been part of a consensual action as opposed to a[] [non]consensual action." She acknowledged that she observed no injuries to J.T.'s neck, but testified that with a strangulation victim, she might or might not find such injuries depending on the amount of pressure applied and length of time. Lackey further acknowledged that "some women on their menstrual cycle can be swollen" in the vaginal area where J.T. was swollen. She added, however, that J.T. had reported that she was at the end of her cycle and "it's not usually common to have that intense of inflammation and swelling" at the end of a menstrual cycle.

¶10 On February 2, 2017, eleven days after the assault and SANE examination, J.T. was seen by nurse practitioner Rita Kadamian at the Racine County Child Advocacy Center at Children's Hospital of Wisconsin [CHW] in Racine. Kadamian prepared a report in relation to her examination of J.T.; however, Kadamian did not testify at Nelson's trial because she was on medical leave at the time. Instead, Michael Cahill, a nurse practitioner in the Milwaukee County Child Advocacy Center at CHW in Milwaukee, testified for the State. Cahill explained that he is on a team of medical providers who evaluate children and adolescents referred to the center because of physical, sexual, or other abuse and that Kadamian works in a similar role at the center in Racine. Cahill testified regarding portions of Kadamian's "medical report" related to her "medical examination" of J.T.

¶11 When asked why J.T. would have been seen at the Racine center on February 2 when she had previously been examined by a SANE nurse on the day of the assault eleven days earlier, Cahill responded that it is "routine standard protocol to medically follow up in about two weeks to do some further testing" for infections, sexually transmitted diseases, and pregnancy. Referring to Kadamian's report, Cahill testified that it indicated Kadamian observed bruising and a healed tear on J.T.'s hymen. He agreed that the report further indicated that these injuries "were consistent with penetrating blunt force trauma." Cahill testified that it is not possible to "date" the bruising or tear that Kadamian observed and confirmed that tissue "down there … heal[s] rather quickly."

¶12 Nelson did not object to the admission of Kadamian's report into evidence or to Cahill's testimony regarding the report. Instead, counsel for Nelson cross-examined Cahill, and in doing so, got Cahill to confirm that he was "not saying whether penetration was forced or consensual" and that the report indicated that J.T. "bruises bleeds easily."

5

¶13 Although Cahill testified to very little of Kadamian's report, and the report was never provided to the jury during its deliberations, in order to later analyze the testimonial versus nontestimonial nature of the report—in relation to Nelson's Confrontation Clause challenge—we note many of its details.

¶14 On page one, the report is titled "Child Advocacy and Protection Services Sexual Abuse Evaluation" and identified as "Progress Notes" of Kadamian. The "Service" is identified as "Child Advocacy-Protection," and there is an indication that the report relates to a "Consultation/evaluation requested by: Caledonia PD [Matthew] Vannucci [and] Racine County Human Services Department Darcy Knutson." The "Chief Complaint" is noted as "Concern for Sexual Abuse." According to the report, J.T. was brought to the Center "by [her] mother" for "consultation/evaluation of possible child maltreatment." The report details the history of the assault as provided by "mother, medical records and patient," including that J.T. reported that Nelson ejaculated during the assault and "did not use a condom."

¶15 Page two of the report indicates that J.T. was being evaluated "for follow up of injuries." It states that J.T. "denies pain or discharge on this date. She reports a small amount of bleeding has continued since the incident." The report details J.T.'s medications and prescriptions as well as prescribed dosages, and indicates "No Known Allergies," "Headache" for "Past Medical History," and "No pertinent past surgical history." It identifies the "Family History" of J.T.'s mother, father, and paternal and maternal grandparents and notes that "[t]here is second hand smoke exposure and there are pets in the home (dog)." The report states that since the assault, J.T. "wakes during night and feels tired all the time" and prior to the assault there were "no concerns with sleep."

¶16    Page three of the report provides a detailed review of numerous "Systems" of J.T., including "Respiratory," "Cardiovascular," "Endocrine," and "Musculoskeletal." For her gastrointestinal system, the report notes that J.T. did have diarrhea "for a few days at start of med[icine] regime," and for her hematological system, the report states: "Bruises/bleeds easily." The report identifies J.T.'s height, weight, pulse, temperature and other "Vitals."

¶17    Page four provides details of Kadamian's "Physical Exam" of J.T., particularly related to her "Systems." Comments provided under "Genitourinary" include:

> The labia majora are unremarkable without lesions or evidence of injury. Clitoral hood, labia minora and urethra are unremarkable. Walls of the vestibule are normal without lesions or erythema. Fossa navicularis is unremarkable without evidence of trauma. The hymen is estrogenized. Contusion is noted on the hymen at 3 o'clock and a healed transection is present at 6 o'clock. Cervix normal in appearance with ectropian present. There is no discharge or odor. Posterior fourchette is unremarkable. Perineum is unremarkable.

The report identifies that only center "staff" was present during J.T.'s examination.

¶18    The "Assessment," on pages four and five, indicates: "1. Child sexual assault, 2. Vaginal bleeding, and 3. Immunization due." It further states:

> [J.T.] is a 17 y.o. female evaluated at the [center] for sexual assault. [J.T.] is noted to have a contusion to the hymen and a healed transection. These injuries are indicative of blunt force penetrating trauma. Genital injuries heal rapidly. The contusion is acute and supports [J.T.'s] disclosure of sexual assault.
>
> Vaginal bleeding: No site of active bleeding is noted on examination. This finding is likely related to a hormonal response from the pregnancy prophylaxis administered following the incident.

> Exposure to toxic stress such as child sexual assault results in a very high risk of adverse health, mental health, and emotional consequences due to the direct and indirect effects of the adversity on the child's physical, psychosocial, cognitive, and emotional development. Because of suspected maltreatment, this child is at high risk of experiencing short-term and long-term negative consequences.

Page five of the report further identifies "Plan," and states, "Orders Placed This Encounter, Procedures: Anogenital exam/Colposcopy, RPR, Rapid HIV ½ Ag Ab w/ Reflex, Hepatitis B Panel, Hepatitis C Ab, POCT Human Chorionic Gonadotropin [hCG] Urine [i.e., pregnancy test]." Page five indicates "No medications ordered at this visit." Kadamian's listed "Recommendations" are:

> Recommend mental health therapy.
>
> Blood testing at local laboratory approximately 02/21/2017.
>
> Continue HIV PEP as directed.
>
> Follow-up with PCP or GYN for worsening/continued vaginal bleeding.
>
> Follow up with PCP for immunizations and repeat HIV, Hepatitis B, Hepatitis C and RPR in 4 months.
>
> Discussed routine adolescent care and contraceptive options.
>
> Education provided: Child sexual abuse; examination and findings; STI testing.
>
> Investigation and safety plan per law enforcement and/or CPS [Child Protective Services].
>
> Discussed medical evaluation and recommendations with mother and patient. They appeared to understand.

Page five further states: "Verbal education provided: Anticipatory guidance; Child sexual abuse; Developmental issues and behaviors; Diagnosis and disease management; HIV; Immunization; Laboratory and radiology testing; Medical evaluation; STI; Traumatic stress."

¶19    The final page of the report identifies J.T.'s current living arrangement, education and employment status, eating habits and activities, history relevant to the use and lack of use of substances, sexual history and practices, and her denial of current symptoms of depression or anxiety. This last page also suggests, via a "CC" notation, that a copy of the report was provided to Knutson, a Dr. George Milonas, and Vannucci.

Closing Argument

¶20    Prior to the presentation of closing arguments at trial, the circuit court provided the jury with various instructions, including: "Consider only the evidence received during this trial and the law as given to you by these instructions, and from these alone … reach your verdict"; "Evidence is … the sworn testimony of witnesses[,] … the exhibits the Court has received, … [and] … any facts to which the lawyers have agreed or stipulated or which the court has directed you to find.… Again, you are to decide the case solely on the evidence offered and received at trial"; "The remarks of the attorneys are not evidence"; and "Consider carefully the closing arguments of the attorneys, but their arguments, conclusions and opinions are not evidence. Draw your own conclusions from the evidence and decide upon your verdict according to the evidence under the instructions given to you by the Court."

¶21    During the prosecutor's initial closing argument, about nine pages worth of transcript, she presented the evidence in support of a finding of guilt for each of the crimes with which Nelson was charged. She explained how, following the assault, Nelson denied having any sexual contact with J.T., but after DNA tests later confirmed that semen found inside her body during the SANE examination was Nelson's, he then took the position at trial that he had had sex with her but that

it was consensual. The prosecutor detailed the evidence of J.T.'s injuries including bruising and bite marks, other evidence of a physical struggle including "scratches all over [Nelson's] back," and J.T.'s testimony that she tried to fight off Nelson. The prosecutor also discussed how such evidence was inconsistent with Nelson's theory that J.T. consented to the sexual encounter and detailed the various forms of violence used by Nelson to which J.T. testified including, as the prosecutor stated it, "grabb[ing] her face," "grabb[ing] her neck, … and put[ting] his fingers in her mouth so she couldn't make any noise while he was sexually assaulting her."

¶22    The prosecutor further discussed the relationship of particular evidence to particular charges, before stating: "You know, I don't know what else I can say about whether or not Thomas Nelson committed these crimes. *I* firstly *believe* that he did. *I think* the evidence absolutely—." (Emphasis added.) At this point, defense counsel objected, and a sidebar was held. Following the sidebar, the prosecutor wrapped up her initial closing argument, stating:

> The evidence in this case shows *us* that he did commit that sexual assault. Her body shows it, his body shows it. The evidence in this case shows *us* that he committed that strangulation. Her body shows that with the bruises on her face and her evidence – her testimony is all evidence. That proves it as well. The evidence shows *us* that he imprisoned her falsely in that room based on the evidence that [J.T.] told you about.

(Emphasis added.)

¶23    After defense counsel presented his closing argument and the prosecutor presented her rebuttal, the circuit court further instructed the jury. It began by repeating an instruction it had provided before the start of closing arguments: "Ladies and gentlemen, consider carefully the closing arguments of the attorneys, but their arguments, conclusions and their opinions are not evidence. Draw your own conclusions from the evidence and decide upon your verdict

10

according to the evidence under the instructions given to you by the Court." The court then provided additional instructions to the jury before the jury began deliberations.

¶24 The jury found Nelson guilty on the charges of second-degree sexual assault and false imprisonment, as well as four of the related felony bail jumping charges, and not guilty on the strangulation charge and two of the related felony bail jumping charges. Nelson was subsequently sentenced and now appeals.

### *Discussion*

¶25 Having neglected or declined to object to the State's use of Kadamian's report through Cahill's testimony, Nelson challenges such use for the first time on appeal, claiming the use violated his right to confrontation and constituted "plain error." Nelson also contends that the prosecutor committed misconduct when she stated during her closing argument, "You know, I don't know what else I can say about whether or not Thomas Nelson committed these crimes. *I firstly believe that he did*," and that the court took insufficient action to address the misconduct, resulting in a denial of due process and plain error. We conclude no errors were committed, but even if errors were committed, they were not "plain errors," and they were harmless.

Kadamian's Report and Cahill's Related Testimony

¶26    Nelson insists his confrontation right was violated and plain error occurred when Cahill testified regarding Kadamian's report.[2]  We disagree.

*Confrontation Clause*

¶27    Before we consider whether "plain error" occurred, we must first determine whether *any* error occurred.  To this end, we consider Nelson's argument that Cahill's testimony as to Kadamian's report violated Nelson's Sixth Amendment right to be confronted with witnesses against him.  This is a question of law we review de novo.  **State v. Mattox**, 2017 WI 9, ¶19, 373 Wis. 2d 122, 890 N.W.2d 256.

¶28    "[A] defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial *if* those statements are 'testimonial' and the defendant has not had 'a prior opportunity' to cross-examine the out-of-court declarant."  **Id.**, ¶24 (emphasis added; citation omitted).  Discussing the United States Supreme Court's sea change in Confrontation Clause jurisprudence in **Crawford v. Washington**, 541 U.S. 36 (2004), our state supreme court observed in **Mattox**:

> The **Crawford** Court did not provide a comprehensive definition of "testimonial," but it concluded that, "at a minimum," "testimonial" statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial and ... police interrogations" because these are the types of evidence "at which the Confrontation Clause was directed."

---

[2] Nelson makes no legal distinction between Kadamian's report and Cahill's related testimony and provides no argument suggesting one should be treated differently than the other. Because of this, the fact that Cahill's testimony that was related to the Confrontation Clause challenge was just directly referencing Kadamian's observations as detailed in her report, and the fact that the jury was never made aware of any portions of the report other than those to which Cahill testified, we too make no legal distinction between the report and Cahill's related testimony.

*Mattox*, 373 Wis. 2d 122, ¶24. "Post-*Crawford*," the *Mattox* court stated, "confrontation challenges begin with an analysis of whether the out-of-court statements used against a defendant are 'testimonial.'" *Mattox*, 373 Wis. 2d 122, ¶24 (citation omitted). "If the statements are not testimonial, the Confrontation Clause is not implicated." *Id.*

¶29 In determining whether an out-of-court statement is testimonial, we must decide "whether, in light of all the circumstances, viewed objectively," the "declarant is acting as a witness against the defendant" by considering whether the "primary purpose" of the statement was to "gather evidence for [the defendant's] prosecution" or "substitute for testimony in a criminal prosecution." *Id.*, ¶¶32, 33 (quoting *Ohio v. Clark*, 135 S. Ct. 2173, 2180-81 (2015)). Some factors for determining the primary purpose of a particular statement include: "(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant[3] and (4) the context in which the statement was given." *Mattox*, 373 Wis. 2d 122, ¶32.

¶30 Here, Kadamian examined J.T. on February 2, prepared the related report, and was the declarant of the content therein. According to the totality of the report itself and Cahill's testimony related to it, the primary purpose of Kadamian's *examination* of J.T. was to evaluate her overall health, treat any conditions needing treatment, and recommend a health care plan for J.T. going forward. The primary purpose of Kadamian's *report* related to the examination, like reports related to most health examinations, was to document Kadamian's medical findings as to the

---

[3] This factor is not applicable to the analysis in this case and will not be discussed further. *See State v. Mattox*, 2017 WI 9, ¶32 n.7, 373 Wis. 2d 122, 890 N.W.2d 256.

condition of J.T.'s health on February 2 and the health care plan and recommendations for J.T.'s care going forward. Because the *primary* purpose of the report was neither "to gather evidence for [Nelson's] prosecution" nor to "substitute for testimony in a criminal prosecution," the report was not testimonial, and thus its use at trial did not implicate the Confrontation Clause. *See id.*, ¶33.

¶31 Considering the first factor of the primary purpose test—the formality/informality "of the situation" producing the out-of-court statement—we note that the *Mattox* court expressed that the "typewritten, titled, and signed" nature of the toxicology report in that case amounted only to "slight formality" and "d[id] not imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might." *Mattox*, 373 Wis. 2d 122, ¶34 (citing *Clark*, 135 S. Ct. at 2180). The same can be said of Kadamian's report.

¶32 As to the second factor, whether the "statement [was] given to law enforcement or a non-law enforcement individual," *id.*, ¶32, the *Mattox* court stated, "statements to persons other than law enforcement officers [are] 'much less likely to be testimonial than statements to law enforcement officers,'" *id.*, ¶34 (citation omitted). Here, Kadamian did not make a statement "*to* law enforcement officers" in the traditional sense of an officer questioning Kadamian and Kadamian informing the officer as to her knowledge related to an offense. That said, Kadamian's report does indicate that her "consultation/evaluation" with J.T. was "requested by" both law enforcement and nonlaw enforcement individuals—police officer Vannucci and human services employee Knutson, respectively—and that a copy of the report was provided to both law enforcement, Vannucci, and nonlaw enforcement individuals, Knutson and Dr. Milonas. The request for the "consultation/evaluation" by a law enforcement officer involved in the criminal case against Nelson and the provision of the related report to that officer certainly suggests that at least some purpose of

the report was related to the investigation of Nelson.[4] However, the fact that a human services employee also requested the "consultation/evaluation" and both she and a physician (perhaps J.T.'s primary care physician) were apparently also provided copies of the report indicates that at least an equal purpose of the report was to document Kadamian's medical findings as to J.T.'s health condition and the health care plan and recommendations for J.T.'s care going forward. The report certainly is in no way akin to "testimonial" statements such as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" or even "police interrogations," which are "the types of evidence 'at which the Confrontation Clause was directed.'" *See id.*, ¶24.

¶33 By themselves, the "slight formality" of Kadamian's report and its provision to a law enforcement officer along with a human services employee and a physician do not answer the question of whether the primary purpose of the report was to "gather evidence for" or "substitute for testimony in" Nelson's prosecution. *See id.*, ¶¶32, 33. Fortunately, there is another factor—"the context in which the statement was given"—that provides greater clarity on the primary purpose of the report.

¶34 The report is a fairly standard medical report, like any that one might see if he/she requested a copy of his/her medical report related to an examination by a health care professional. While part of the context is that the February 2 examination was performed and the report was made eleven days after the sexual

---

[4] We do not assume a prosecutorial purpose of the "consultation/evaluation" merely from the fact a law enforcement officer was one of the individuals who requested it. Certainly a law enforcement officer interacting with a sexual assault victim would have concern for the health and well-being of that victim and, acting on this concern, well might request that the victim seek medical attention, regardless of any potential prosecutorial purpose. In this case, however, the fact that a copy of Kadamian's report appears to also have been provided to the law enforcement officer suggests some prosecutorial purpose.

assault and as a follow-up to that assault, this is to be expected in that, according to Lackey's testimony, J.T.'s body bore many obvious injuries on January 21—bruises, bite marks, and injury to her vaginal area—indicating she had suffered a traumatic physical event. Indeed, Kadamian's report itself indicates that the evaluation was "for follow up of injuries." J.T. had also indicated to Lackey that Nelson did not wear a condom and ejaculated more than once during the assault. Cahill, who performed for CHW in Milwaukee the same type of Child Advocacy Center role as Kadamian did for CHW in Racine, testified that J.T. would have been seen at the Racine center eleven days after the assault because it was "routine standard protocol" to "medically follow up" about two weeks after a sexual assault in order to test for infections, sexually transmitted diseases, and possible pregnancy stemming from the assault.

¶35 The report documents J.T.'s sleep problems following the assault, injuries to her hymen, and various testing—focused on J.T.'s health—that was ordered at the February 2 examination. Also significant, Kadamian's report indicates that

> [e]xposure to toxic stress such as child sexual assault results in a very high risk of adverse health, mental health, and emotional consequences due to the direct and indirect effects of the adversity on the child's physical, psychosocial, cognitive, and emotional development. Because of suspected maltreatment, this child is at high risk of experiencing short-term and long-term negative consequences.

Thus, Kadamian's report was also focused on seventeen-year-old J.T.'s mental health, which understandably could be significantly compromised as a result of the assault eleven days earlier.

16

¶36    Kadamian's "Recommendations" include "mental health therapy" and "[b]lood testing at local laboratory approximately" three weeks later as well as the recommendation that J.T. follow up with her primary care physician ("PCP") or gynecologist "for worsening/continued vaginal bleeding" and with her PCP "for ... repeat HIB, Hepatitis B, Hepatitis C and RPR in 4 months." Kadamian further wrote that she discussed "routine adolescent care and contraceptive options" and the "medical evaluation and recommendations with mother and patient," adding that they "appeared to understand."

¶37    Kadamian's examination of J.T. and creation of the related report were focused on J.T.'s health, not the gathering of evidence for prosecution of Nelson or serving as a substitute for testimony against him. *See Mattox*, 373 Wis. 2d 122, ¶37. As indicated, the *primary* purpose of the examination was to evaluate J.T.'s health, treat her as needed, and recommend a health care plan for her going forward. As to the report, while snippets of it had potential value to the prosecution of Nelson—and to his defense—*see infra* note 7, the totality of it indicates its *primary* purpose was not to aid in prosecuting him but to document Kadamian's medical findings as to J.T.'s health condition on February 2 and record the health care plan and recommendations for her care going forward. Any possible prosecutorial use was secondary.

¶38    While a challenge to the SANE report from the January 21, 2017 examination of J.T. is not before us, because Nelson significantly conflates in his briefing *Lackey's* January 21 SANE examination of J.T. with Kadamian's February 2, 2017 non-SANE examination—and by implication their respective reports—we think it appropriate to directly compare the nature of the two types of examinations.

17

¶39     Lackey testified to her role as a SANE nurse and her SANE examination of J.T. on the day of the assault.  To become a SANE nurse, Lackey received significant additional training above and beyond that needed to become a registered nurse.   She was trained in "the fundamentals of sexual assault examinations, assessing injuries, documentation, [and] evidence collection," and attended forty hours of training "instructed by members of the Department of Justice [DOJ]."   She then attended a course where she "received further training on evidence collection and the assessment of a victim."

¶40     Discussing the main difference between a SANE examination and "a physical," Lackey noted that with a SANE examination, "we actually collect evidence, DNA."   In addition, a victim advocate is present during a SANE examination, and a law enforcement officer usually is also present when the victim provides the history of the assault, which is what occurred during Lackey's January 21 SANE examination of J.T.

¶41     Detailing the examination she performed on J.T., Lackey explained that it was performed in a "specialty forensic exam room."  Lackey secured urine and blood samples from J.T. because there was reason to believe "this was a drug or alcohol facilitated assault," not because securing such samples were important for J.T.'s own health.  Lackey set up an evidence collection kit from DOJ "based on what [J.T.'s] history of [the] assault was and where [Lackey felt] the most evidence and DNA c[ould] be collected off of her body."  Lackey meticulously collected J.T.'s clothes and placed them "in a bag for evidence collection," which she then sealed.

¶42    During the January 21 SANE examination, Lackey took photographs "for evidence" in the "particular way" that she had been taught.[5]  After examining the outside of J.T.'s body, Lackey collected evidence from J.T.'s mouth and hands as well as her breasts, arm, inner thigh and neck, because J.T. had indicated that Nelson had made contact with her in those areas.  Lackey also photographed and collected evidence from J.T.'s genitalia.  After collecting the evidence, Lackey sealed it in an envelope, initialed over the seal, and placed the envelope in an evidence collection box that was then sealed and "handed off to a police officer" and it "ultimately [went] to the crime lab."  Lackey explained how she also took and preserved evidence from *Nelson*.  On cross-examination, she agreed that "[p]art of [her] job is to collect evidence for criminal prosecution purposes."

¶43    In stark contrast, the record gives no indication that Kadamian, or Cahill—who functioned in a role similar to Kadamian—were ever instructed by DOJ or received training related to evidence collection.  Furthermore, at her February 2 examination of J.T., Kadamian collected and sealed no evidence, much less handed it off to a police officer so that it would get to "the crime lab."  She never collected J.T.'s clothes or took photographs of J.T. in any way, much less a "particular way" for use as evidence.  There was no victim advocate or law enforcement personnel present for any portion of Kadamian's examination of J.T.  While Lackey's January 21 SANE examination was heavily focused on the

---

[5] Lackey testified that she was "taught to take [photographs] from a distance so we can see a full picture of her body, then zooming in closer and closer, and then use of rulers" to "show the length and the diameter of the injury."

collection and preservation of evidence of the assault for law enforcement, Kadamian's February 2 examination was focused on J.T.'s health.

¶44    Nelson spends a significant portion of his briefing arguing that Kadamian's report was testimonial because *she*—Kadamian—is a SANE nurse and performed a SANE examination on J.T.[6]    Relatedly, Nelson also states there is "significant case law from other jurisdictions where courts have found ... a victim's

---

[6] Nelson writes:

> [SANE nurses] are trained and certified through the Wisconsin Department of Justice which operates a "Medical Forensic Program."  The explicit and bold banner for the program's web site claims, "Working with crime labs to *collect physical evidence*."  Under the category of "What is a medical forensic examiner?" the first function noted by DOJ is that "Sexual assault forensic examiners perform the medical forensic exam, gather information for the medical forensic history, collect and document forensic evidence, and document pertinent physical findings from patient."  Of course, the DOJ notes that they also "testify in court, if needed."  Indeed, they are specifically trained in "Courtroom testimony and Legal Considerations."  Sexual assault nurse examiners are additionally trained that their role and purpose is to function as part of a "county based team," a "sexual assault response team," or "SART."

> Also on the team are a law enforcement representative and a prosecutor.  *As such*, although *Kadamian* was not a peace officer, she *was by formal training and protocol part of the law enforcement and prosecutorial team*.

> *She was also an agent of law enforcement by statute*.  In this regard, WIS. STAT. § 949.20, "Sexual Assault Forensic Examination Compensation," provides a specific and explicit mechanism by which a "health care provider" is compensated by the state, through the Department of Justice, in exchange for collecting evidence for a law enforcement agency.

> ….

> … [Kadamian] was ... a professional who *was formally and specifically trained to collect, document, and preserve evidence* as the primary purpose of her examination of a sexual assault victim.

(Emphasis added.)

statements to a *SANE* nurse to be testimonial." (Emphasis added.) The problem with Nelson's argument is he has identified no evidence in the record indicating *Kadamian* is a *SANE* nurse, was trained to function as a SANE nurse, ever performed a SANE examination in her life, or has ever been trained by members of DOJ. The evidence overwhelmingly suggests Kadamian is not a SANE nurse and did not perform a SANE examination on J.T.

¶45 Perhaps Nelson mistakes Kadamian for Lackey, who unquestionably was a SANE nurse (and trained by DOJ), performed a SANE examination on J.T. the day of the assault, and in doing so, was clearly focused on collecting evidence for potential criminal prosecution. But Kadamian is not Lackey and the examination Kadamian performed on J.T. eleven days after Lackey's was a very different examination, with a different primary purpose, from that performed by Lackey. While a strong argument could be made that the primary purpose of Lackey's examination was for criminal prosecution, the primary purpose of Kadamian's examination of J.T., as indicated, was to evaluate her health condition on February 2, treat her as needed, and recommend a health care plan for her going forward. The primary purpose of the related report was to document Kadamian's medical findings and record the health care plan and recommendations for J.T.'s future care. Because the primary purpose of Kadamian's report was neither "to gather evidence for" nor "substitute for testimony in" the prosecution of Nelson, the report and Cahill's related testimony did not constitute "testimonial" statements. As a result, the Confrontation Clause was not implicated, *see **Mattox***, 373 Wis. 2d 122, ¶37, and Nelson's Confrontation Clause challenge fails.

*Plain Error Doctrine*

¶46 The "plain error" doctrine "allows appellate courts to review errors that were otherwise forfeited by a party's failure to object." *State v. Miller*, 2012 WI App 68, ¶18, 341 Wis. 2d 737, 816 N.W.2d 331. As we have stated,

> Plain error is "error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." The error, however, *must be* "*obvious* and substantial," and courts should use the plain error doctrine sparingly. There is no bright-line rule for what constitutes plain error. Rather, the existence of plain error will turn on the facts of the particular case.

*Id.*, ¶18 (emphasis added; citations omitted). The defendant bears the burden in the first instance to "show[] that the unobjected to error is fundamental, *obvious*, and substantial." *State v. Jorgensen*, 2008 WI 60, ¶23, 310 Wis. 2d 138, 754 N.W.2d 77 (emphasis added). This court independently reviews the record to determine if a new trial is warranted due to plain error. *State v. Mayo*, 2007 WI 78, ¶28, 301 Wis. 2d 642, 734 N.W.2d 115.

¶47 As we have concluded, Kadamian's report and Cahill's related testimony were nontestimonial, the Confrontation Clause was not implicated in the admission of this evidence, and thus there was no error. But even if this was a "close call," which it is not, Nelson certainly has not met his burden to demonstrate that

any error was "obvious"—a necessary showing for us to conclude an error constitutes "plain error."[7]

---

[7] Because Nelson chose to challenge the State's use of Kadamian's report and Cahill's related testimony on plain error grounds instead of ineffective assistance of counsel grounds—due to his defense counsel's failure to or decision not to object to this evidence—there is no **Machner** hearing testimony that would provide insight into counsel's reasons for not objecting. *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). It may be that counsel strategically chose not to object due to the value of the report and testimony to *Nelson*. For example, on cross-examination, counsel successfully pressed Cahill until Cahill acknowledged that Kadamian's report noted that J.T. "bruises bleeds easily." Counsel then utilized that evidence in his closing argument to argue that the injuries to J.T. were consistent with Nelson's theory that he engaged in "rough" but consensual sex with J.T. not violent, nonconsensual sex, as J.T. alleged:

> We talk about the bruises. She's got some bruises. I dare suspect if any of you go home and look in the mirror, you will have bruises that are much worse or worse than what you just saw there. You … get home and you say, gee, how did that happen? You don't even know at times. But you compare that to what she testified to.
>
> She testified that he was all over her, he throttled her repeatedly. He bit her repeatedly all over her body. She even said he drew blood. He did all those things, and yet only the two marks where it could be or may be bite marks. There's two marks.
>
> … It doesn't take much when people are engaging in a little rough sex to have that kind of stuff, but use your common sense….
>
> *Plus what does Childrens Hospital say? She's easily bruised. So first of all, she's easily bruised.… [T]hat's one of [the findings]. She was easily bruised.*
>
> So you have to look at all of that because the pictures you see do not show somebody whacking around somebody with vicious force. It just doesn't show that because it never happened.

(Emphasis added.) For better or worse, the plain error doctrine allows a defendant to utilize at trial evidence he/she hopes may aid him/her in securing a not guilty verdict and if that turns out unsuccessful, then claim "plain error" on appeal without requiring testimony from defense counsel as to whether he or she had a strategic reason for not objecting.

¶48    Akin to the ineffective assistance of counsel requirement that the law must be "clear" and "settled" before it can be said that counsel performed deficiently in taking or failing to take a particular action, *see State v. Morales-Pedrosa*, 2016 WI App 38, ¶¶16, 26, 369 Wis. 2d 75, 879 N.W.2d 772; *State v. McMahon*, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994), for an error to constitute "plain error," the error must be not only fundamental and substantial but also "obvious" or "clear," *see State v. Lammers*, 2009 WI App 136, ¶12, 321 Wis. 2d 376, 773 N.W.2d 463 ("'Plain error' means a clear or obvious error."). In this case, it cannot reasonably be argued that it was clear/obvious that the *primary* purpose of Kadamian's report was "to gather evidence for" or "substitute for testimony in" the prosecution of Nelson and thus that it was clear/obvious that the report was testimonial and its use even implicated, much less violated, Nelson's Confrontation Clause right. While we conclude no error occurred, there certainly was no plain error. We further note that, for the reasons stated below, *see infra* ¶¶49-51, any

---

We further note that in addition to somewhat supporting Nelson's theory that Nelson engaged in consensual "rough" sex with J.T. as opposed to nonconsensual rough/violent sex, counsel's use of Kadamian's report and Cahill's related testimony could well have contributed to the not guilty verdict on the felony strangulation charge, and the two related felony bail jumping charges. This is so because while J.T. testified on direct examination that Nelson "choked" her and went further on cross-examination by agreeing that Nelson choked her "repeatedly," "very, very hard," and to the point of "restrict[ing] [her] breathing," Lackey testified that during her SANE examination of J.T. hours after the assault, she found evidence of bruising on multiple other areas of J.T.'s body but no evidence of bruising or petechiae (i.e., "the popping of blood vessels in the smaller capillaries") on J.T.'s neck. The jury could easily have concluded that if J.T. had bruises on other areas of her body and generally "bruises bleeds easily," as indicated by Cahill's testimony from Kadamian's report, and Nelson had in fact strangled her as J.T. testified, one would expect to see some bruising or petechiae on J.T.'s neck as well. Furthermore, beyond the obvious relevance to the strangulation and related bail jumping charges, if the jury questioned J.T.'s testimony that Nelson strangled her "repeatedly" and "very, very hard"—as it apparently did since it acquitted him on this charge and the related bail jumping charges—this lack of confidence in her testimony as to some aspects of what happened during the sexual encounter necessarily threatened to undermine the jury's confidence in J.T.'s testimony as to other key aspects of the encounter, including whether or not it was consensual. All of this is to say that it is entirely possible that, for strategic reasons, Nelson's counsel may have actually wanted Kadamian's report and Cahill's related testimony to be used at trial, but the plain error doctrine takes no account of that.

"error" related to Cahill's testimony regarding Kadamian's report also was not "substantial," another required showing for an error to constitute a "plain error." *See* ***Jorgensen***, 310 Wis. 2d 138, ¶23; ***Miller***, 341 Wis. 2d 737, ¶18.

*Harmless Error*

¶49 Even if admission of the report was error, the error was harmless. *See* ***State v. Hunt***, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434 (An "error is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" (citation omitted)). To begin, the report was never shown to the jury, so the jury's knowledge related to it was limited to the very minimal portions of it presented through Cahill's testimony. The substance of his testimony as to the report was that on February 2, 2017, Kadamian had observed bruising and a healed tear on J.T.'s hymen, indicated that these injuries "were consistent with penetrating blunt force trauma," and noted that J.T. "bruises bleeds easily." In addition to his testimony related to the report, Cahill also indicated that it was not possible to "date" the bruising or tear, tissue "down there ... heal[s] rather quickly," and he was "not saying" that the injury to J.T.'s hymen was caused by "penetration [that] was forced or consensual."

¶50 Two witnesses earlier, however, SANE nurse Lackey testified that just hours after the assault, she observed an injury, either a tear or abrasion, to and significant swelling of J.T.'s vagina. Lackey added that she further observed what "look[ed] like an abrasion" on J.T.'s labia minora and "swelling and inflammation" on her labia majora. While Lackey acknowledged that "some women on their menstrual cycle can be swollen," she added that "it's not usually common to have that intense of inflammation and swelling" at the end of a menstrual cycle, and J.T. was at the end of her cycle. Thus, while Cahill testified that Kadamian's report

indicated Kadamian had observed bruising and a healed tear on J.T.'s hymen, this added no evidence of import that Lackey had not already effectively provided through her testimony regarding the injuries she observed to J.T.'s vaginal area. And while Cahill did testify that Kadamian indicated in her report that the bruising and tear to J.T.'s hymen "were consistent with penetrating blunt force trauma," he also confirmed that he was "not saying" whether the "penetration was forced or consensual." Lackey similarly acknowledged that it was possible the injuries to J.T.'s vaginal area "could have been part of a consensual action as opposed to a[] [non]consensual action."

¶51 Significantly, the question before the jury was not whether Nelson had had sexual intercourse with J.T. on January 21, 2017, whether J.T. had injuries to her vaginal area following the intercourse, or even whether the intercourse caused the injuries; rather, the question was whether J.T.'s injuries were caused during consensual rough sex, as Nelson argued, or nonconsensual rough/violent sex, as J.T. testified and the State argued.[8] On this determinative point, Cahill's testimony added nothing beyond what was indicated by Lackey's unchallenged testimony, and thus we are convinced beyond a reasonable doubt that the result of this case would

---

[8] In his opening statement, Nelson's counsel laid out Nelson's theory of defense that Nelson and J.T. "had some rough sex. But that doesn't make it illegal or forced or coerced." In her closing argument, the prosecutor engaged on Nelson's theory. After discussing J.T.'s testimony regarding Nelson choking her and putting his fingers in her mouth during the assault, the scratches J.T. inflicted on Nelson's body, and the bruises and bite marks on J.T.'s body, the prosecutor continued: "Does she look like someone who had rough sex with someone who [sic] enjoyed it? No, she looks like somebody who was desperately trying to get him to stop." In his closing argument, Nelson's counsel again argued that Nelson and J.T. "engag[ed] in a little rough sex." J.T. unmistakably testified that she did not consent to the sexual intercourse and repeatedly told Nelson "No."

have been the same for Nelson (or possibly worse, *see supra* note 7 strangulation discussion) if Cahill had never testified regarding Kadamian's report.

Prosecutor's Comment in Closing Argument

¶52     Near the end of the prosecutor's initial closing argument, she stated: "You know, I don't know what else I can say about whether or not Thomas Nelson committed these crimes.  I firstly believe that he did …."[9]  Nelson claims this comment constituted misconduct and that the circuit court's failure to take additional steps to "cure" it resulted in a denial of due process and plain error.  We conclude there was no error.

¶53     We review as a matter of law whether a due process violation or plain error has occurred.  *See* ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468; ***Mayo***, 301 Wis. 2d 642, ¶28.

¶54     "Closing argument is the lawyer's opportunity to tell the trier of fact how the lawyer views the evidence and is usually spoken extemporaneously and with some emotion." ***State v. Adams***, 221 Wis. 2d 1, 19, 584 N.W.2d 695 (Ct. App.

---

[9] Scattered throughout her initial closing argument detailing and reasoning through the evidence, the prosecutor made several other similar comments, such as, "Well, that's not what the evidence shows *me*," "*I* don't think [J.T.] consented to the sexual intercourse," "Did he use violence?  *I* think he did, and her body proves it," and "[t]he evidence tells *me* that Thomas Nelson raped [J.T.] against her will."  (Emphasis added.)  Because Nelson did not object, either at trial or on appeal, to these or to any other comments by the prosecutor, he has forfeited and abandoned any objection to them.  *See* ***Apex Elecs. Corp. v. Gee***, 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998) ("The oft-repeated rule of Wisconsin appellate practice is that issues not raised in the circuit court will not be considered for the first time on appeal."); ***Reiman Assocs., Inc. v. R/A Advert., Inc.***, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292 (Ct. App. 1981) (issues not "briefed or argued on appeal" are abandoned).  And because she made these additional comments, even if the circuit court did err in some way with regard to the one comment Nelson does challenge on appeal, such error was harmless as the prosecutor repeatedly informed the jury of her personal view of the evidence several times throughout the closing argument.  All that said, we conclude that there was no error with regard to these unchallenged comments for the same reasons we conclude there was no error related to the comment Nelson does challenge.

1998) (citation omitted). And as Nelson recognizes in his brief-in-chief, a prosecutor may "tell a jury what he or she believes is the truth of the case, [if] it is clear that the [prosecutor's] belief is merely a comment on the evidence before the jury." This is consistent with the law. As our supreme court has stated:

> The judicially established guideposts for a prosecutor's closing argument are basic. This court has said that counsel in closing argument should be allowed "considerable latitude," with discretion to be given to the trial court in determining the propriety of the argument. The prosecutor "*may comment on the evidence,* detail the evidence, argue from it to a conclusion, *and state that the evidence convinces him* [or her] and should convince the jurors." …
>
> The line between permissible and impermissible argument is … drawn where the prosecutor goes beyond reasoning from the evidence to a conclusion of guilt and instead suggests that the jury arrive at a verdict by considering factors other than the evidence.

*State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979) (emphasis added; citations omitted).

¶55    As Nelson acknowledges, the challenged comment came at the end of the prosecutor's summation of the evidence. The comment did not amount to misconduct as it was merely a comment on what the evidence showed and was directly connected to the prosecutor's summation of the evidence showing Nelson's guilt; it was effectively a comment that the prosecutor was convinced by the evidence and the jury should be too. The law permits this. *See id.*

¶56    While Nelson focuses on the prosecutor's statement of "You know, I don't know what else I can say about whether or not Thomas Nelson committed these crimes. I firstly believe that he did…," the next comment by the prosecutor is noteworthy. Her next words were "I think the evidence absolutely—" at which point Nelson's counsel objected and a sidebar was held.

28

¶57    Leading up to the challenged comment, the prosecutor carefully detailed the trial evidence for the jury and reasoned from it in arguing for a finding of guilt on each of the charges.  At the end of her summation, the prosecutor expressed her belief that the evidence supported a finding of guilt as to each crime, a belief the jurors of course would have already known as the prosecutor had brought the charges, put forth the evidence, and presented an impassioned closing argument in trying to convict Nelson on each charge.  Because of defense counsel's objection almost immediately after the prosecutor's challenged comment, the prosecutor did not get to finish her "I think the evidence absolutely—" statement.  For this reason, we do not know exactly what the prosecutor would have stated, but it is clear she was returning to her focus on the evidence itself.

¶58    As indicated, a claim of "plain error" can be utilized in circumstances where defense counsel failed to object to the challenged action by a prosecutor.  *See Miller*, 341 Wis. 2d 737, ¶18.  But here, Nelson's counsel *did* object and asked to "approach" the bench.  A sidebar discussion was held, and the prosecutor thereafter resumed her initial closing argument.  We can easily assume the sidebar led to the prosecutor modifying her word choice for the remainder of her initial closing argument as she had been using "I" and "me" up until that point, *see supra* note 9, but then immediately switched to "us" for the brief remainder of her initial closing, firstly stating, "The evidence in this case shows *us* that he did commit that sexual assault."[10]  (Emphasis added.)  The circuit court *also* responded to defense counsel's objection by *restating* to the jury—in its first instructions following the conclusion of closing arguments—that the "arguments, conclusions and … opinions [of the attorneys] are *not evidence*" and then "[d]raw your own conclusions from the

---

[10] While it is not entirely clear who the prosecutor meant by "us," it can be reasonably inferred that "us" included the jury if not everybody who was present for the trial.

*evidence* and decide upon your verdict according to the *evidence* under the instructions given to you by the Court." (Emphasis added.) Thus, defense counsel did object, and the court did take appropriate responsive action.

¶59 Recognizing that defense counsel objected and the circuit court responded, Nelson grasps at straws in pointing out that the court "did not strike the prosecutor's remark or instruct the jury that it should not consider it," "did not specifically address the prosecutor's particular remark," or "admonish or rebuke the prosecutor in any respect." These arguments go nowhere as Nelson fails to develop any argument for how the response the circuit court did provide actually amounted to error or how these other suggestions would have been more appropriate or beneficial, especially in light of the fact it is often a specific and reasonable trial strategy of defense attorneys to avoid drawing unnecessary attention to a concerning remark. *See, e.g.*, *State v. Jackson*, 2011 WI App 63, ¶31, 333 Wis. 2d 665, 799 N.W.2d 461. Moreover, the court did instruct the jury—twice—that it should base its decision on the "evidence" and that the "arguments, conclusions and opinions" of counsel are "not evidence." We presume the jury follows the court's instructions, *see State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989), and as the State notes in its response brief, "Nelson does not provide any reason to believe that the jury failed to follow that instruction."

¶60 While neither the prosecutor, the circuit court, nor defense counsel committed error with regard to the challenged remark of the prosecutor, even if the court's failure to take the specific actions Nelson now claims it should have taken did amount to error, such failure certainly did not amount to "plain error." As previously noted, plain error is not just error, but error that is "clear" and "obvious." It is not clear and obvious that the court's response to Nelson's objection by engaging in a sidebar discussion with the parties that led to (1) the prosecutor

changing her pronoun choice and (2) the court repeating the comments-of-the-attorneys-are-not-evidence instruction, rather than taking Nelson's now-preferred actions, was error.

¶61    In *State v. Davidson*, 2000 WI 91, 236 Wis. 2d 537, ¶88, 613 N.W.2d 606, our supreme court stated:

> When a defendant alleges that a prosecutor's statements constituted misconduct, the test we apply is whether the statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' We cannot conclude that the prosecutor's statements in this case were so egregious as to constitute plain error. The comments were limited in scope, and the trial court sustained the defendant's objections and directed the prosecutor to limit his argument to the facts in evidence. The defendant made no motion for mistrial after the trial court addressed the objections. "[A]ll we can assume is that the defendant was satisfied with the court's ruling and curative measure, and that he had no further objections. The defendant took his chances with the jury, curative instruction and all." Accordingly, we find no plain error ....

(Citations omitted).  The same holds for this case.  Nelson did object, the court took action in response, and Nelson raised no concerns and made no motion for mistrial thereafter.  "[A]ll we can assume is that [Nelson] was satisfied with the court's ruling and curative measure, and that he had no further objections.  [Nelson] took his chances with the jury, curative instruction and all."  *See id.*  We find no error.

    *By the Court.*—Judgment affirmed.

31

¶62    DAVIS, J. (*concurring*).   I write separately to emphasize certain aspects of this case that, in my view, inevitably lead to the result we reach but also demonstrate that our decision should not be read as foreclosing the possibility, if not likelihood, that in future cases, the testimony of an examining nurse in a sexual assault case (whether a SANE nurse or anyone else) should be viewed as testimonial, subject to the Sixth Amendment right of confrontation.  Consequently, it would be a mistake for future parties considering either the presentation of, or objection to, such testimony, whether it be from a report or otherwise, to take from our decision any message that such testimony is generally admissible.  It is not.  It is admissible in this case, where a nurse practitioner acted as a surrogate to describe the forensic findings in a report prepared by another nurse (who may or may not have been a SANE nurse) and where there was no objection (the particular importance of which, in cases such as these, is a point I address below).  Although guidance can be gained from our decision, the underlying evidentiary issue is one that, for better or worse, defies easy categorization, and should be addressed on a case-by-case basis.

¶63    This appears to be the first published decision in Wisconsin addressing the Sixth Amendment implications of testimony provided by a medical professional acting as a surrogate for a nontestifying witness in a sexual assault case.[1]  Review of similar cases around the country shows a divergence of results.

---

[1] In *State v. Higgins*, No. 2010AP861-CR, unpublished slip op. ¶28 (WI App. Feb. 1, 2011), this court issued an authored but unpublished decision concerning the admissibility of statements of a minor sexual assault victim to a SANE nurse under the medical records exception to hearsay.

Close inspection reveals that this divergence stems from factual differences among the cases, rather than disagreement on the applicable legal standard. Vivid proof of this point comes from two decisions, unanimously decided by the same court on the same day, reaching opposite conclusions about the testimonial nature of a SANE nurse report. In *State v. Bennington*, 264 P.3d 440 (Kan. 2011), the Kansas Supreme Court provided a detailed analysis on this issue, concluding that a SANE nurse report was testimonial under the facts of that case—facts that included the presence of a police officer taking notes during the history portion of the exam and providing questions for the nurse to ask during the examination portion. In the companion case of *State v. Miller*, 264 P.3d 461 (Kan. 2011), that same court reached the opposite conclusion with respect to statements made by a four-year-old sexual assault victim to a SANE nurse without police officer presence, finding such statements nontestimonial because they were made primarily for medical purposes.

¶64 In short, a SANE or similar exam may give rise to testimonial evidence in one situation and not another. I will not rehash the reasons why the evidence compels a finding that the primary purpose of Kadamian's examination was not testimonial under current Sixth Amendment jurisprudence, other than simply to reiterate what is implicit in the Majority opinion: even in *this case*, a different result may have ensued had the surrogate testified for Nurse Lackey, rather than Kadamian. Majority, ¶¶38-43.

¶65 A different result on the testimonial issue could also have been possible had an adequate trial record been made, which leads to the second aspect of this case that bears emphasis: the uniquely important role played by the requirement for a contemporaneous objection in Confrontation Clause cases. The lack of such an objection seals the result here. The rule that claimed error on such grounds must be preserved by a contemporaneous objection, with little room for the

2

later invocation of plain error, serves at least two important roles in Confrontation Clause cases, and particularly in Confrontation Clause cases involving a surrogate testifying for an unavailable forensic expert.

¶66 First, contemporaneous objection allows the parties and the trial court to fully flesh out whether the objected-to testimony is, in fact, testimonial. The Dissent asserts that Kadamian's report is conclusively testimonial based only on some language in the prosecutor's closing argument (at which point the possible testimonial nature of Kadamian's report was irrelevant), along with a brief notation (which is itself hearsay) in that report showing that the exam was requested by *both* law enforcement and medical personnel. I disagree with the Dissent's view, not because there is no possibility that it is right, but because a possibility is all it is, and that is due to the inherent difficulty in assessing the testimonial nature of this type of proof without any factual development of the sort that would occur upon a proper objection. With an objection, the parties, the trial court, and, if necessary, this court, would have had the opportunity to fully assess, through one or more witness voir dires, the purpose of the exam, including the significance of the reference to law enforcement, and we would not be left to now speculate on appeal. As it stands, the only nonhearsay evidence we have on this point is Cahill's testimony—in which he stated that these follow-up exams serve a primarily *medical* purpose.[2] And, as the

---

[2] This testimony would suggest that Kadamian's report was not testimonial regardless of whether she is a SANE nurse. *Cf. id*, ¶31 (statements to SANE nurse fell within hearsay exception for statements made "for medical diagnosis or treatment").

Majority notes, this testimony is fully consistent with the "Plan" and "Recommendations" portion of the report itself.[3]

¶67    The second purpose served by the requirement of a contemporaneous objection is perhaps even more salient—it allows reviewing courts to determine if the error in failing to object was, in fact, error at all, as opposed to a strategic choice based on a reasonable belief that the defense would be better off with the surrogate than the actual witness.  As noted by the Seventh Circuit in a case that also involved a surrogate expert (a chemist in a drug case):

> Hearsay usually is weaker than live testimony, and defendants may prefer the hearsay version rather than making an objection that would compel the prosecution to produce a stronger witness.  If a confrontation-clause objection had been made and granted in this case, for example, the result would have been the appearance of [the chemist who performed the lab work] Olson on the stand, and then defendants would have been worse off than they were with [the surrogate testifying chemist] DeFrancesco— for defense counsel could undermine DeFrancesco's testimony by reminding the jury that he had not done any of the work and that flaws in Olson's procedures may have been omitted from the lab notes.  That it may be to defendants' advantage to accept the hearsay version of evidence makes it problematic to entertain a *Crawford* claim via the plain-error clause of Fed.R.Evid. 103(d). A defendant who sincerely wants live testimony should make the demand, so that the declarant can be produced.  The lack of a demand for testimony by an available declarant leads to the

---

[3]    An objection would have also allowed the parties to address the question, raised in the Majority opinion, of whether Kadamian was, in fact, a SANE nurse.  Although the Dissent suggests that we do not have that information because Kadamian was not at trial, to the extent this point is relevant to whether her report is testimonial, the fact remains that it was the defendant's failure to object that prevented this information from being developed for purposes of determining whether a surrogate witness should have been permitted to testify about Kadamian's report.  It is not the State's obligation to anticipate the need to make a record sufficient to rebut a later claim of unobjected-to error based on plain error grounds.  As noted below, it is also possible that arrangements could have been made to produce Kadamian if an objection had been made.

conclusion that the appellate argument is strategic rather than sincere.

*United States v. Moon*, 512 F.3d 359, 361 (7th Cir. 2008).

¶68    These concerns are fully in play here.  Certainly a distinct possibility exists that Nelson's counsel made a deliberate, and quite reasonable, decision not to object to Cahill as a surrogate witness—counsel may have had good reason to believe that an objection would have simply prompted the State to call Kadamian back from medical leave.  For all we know, the State may have even told Nelson's counsel in advance that Kadamian was on medical leave but, if necessary, could be brought back or testify by video, and counsel, realizing that Kadamian's testimony would likely be more damaging than Cahill's, agreed to the surrogate.  Or perhaps counsel knew more about the purpose of Kadamian's report than the sparse clues in this record let on, including why the exam was performed or whether Kadamian was a SANE nurse.  No court, to my knowledge, has overturned a conviction on plain error grounds where the lawyer's failure to object was a conscious, reasonable strategic decision.  Such a result creates the potential for sandbagging and multiple retrials, with all the attendant costs (financial certainly, but particularly in cases of this nature, emotional too) that entails.  It is perhaps in part for this reason that the United States Supreme Court stated, post-*Crawford v. Washington*, 541 U.S. 36

(2004), that "the defendant *always* has the burden of raising his Confrontation Clause violation." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 327 (2009).[4]

¶69    Without a more developed record, we do not know if an objection would or even should have been sustained and, critically, we do not know if the failure to object was a strategic choice. Cahill was simply called to the stand and allowed to testify unimpeded by an objection, with the offhand statement of the prosecutor that Kadamian was on "medical leave" being the only clue given as to why there was need for a surrogate. But we do have a ready-made legal vehicle for learning more—a vehicle that should, in cases where a defendant suffers legitimate, unfair harm from unobjected-to error, provide a level of protection as robust as the plain error doctrine. That vehicle, of course, is an ineffective assistance of counsel claim. Nelson could have brought such a claim, but—perhaps tellingly—did not. Had he done so, it would almost certainly have led to a *Machner* hearing,[5] where the trial court could have learned exactly why counsel did not object and then determined whether the failure to do so was a reasoned choice or an oversight that might lead to a deficiency finding under *Strickland v. Washington*, 466 U.S. 668 (1984). Any chance that the defendant was using plain error as a device to secure

---

[4] This statement by the United States Supreme Court was in response to what it characterized as "sky falling down" arguments of the dissent concerning logistical problems in requiring in-person testimony to admit forensic analyst reports, and in particular the concern that applying the Confrontation Clause to such reports would undermine the statutes that exist in some states imposing on defendants the burden of providing notice of the defendant's intent to confront forensic analysts. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325-27 (2009). The Court's emphatic expression as to the defendant's unqualified obligation to object appears to be an acknowledgment of the important purpose such objections serve to ensure an orderly application of the Confrontation Clause under the expanded regime ushered in five years earlier by *Crawford v. Washington*, 541 U.S. 36 (2004).

[5] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

an impermissible "do over" on the basis of a reasonable but unsuccessful trial strategy would be minimized, if not eliminated.

¶70     From an institutional standpoint, an ineffective assistance of counsel claim is a more desirable way to address these types of errors than through an analysis that ascribes plain error to what may have actually been a well-reasoned strategic choice. Only where a reviewing court can conclude that no reasoned strategic choice not to object was *possible* should plain error enter the picture. ***State v. Jorgensen***, 2008 WI 60, 310 Wis. 2d 138, 754 N.W.2d 77, relied on by the Dissent for the proposition that plain error can attach to unobjected-to Confrontation Clause violations, would appear to be such a situation. That was a case where the prosecution was permeated with Confrontation Clause violations (and others as well, including inappropriate conduct by the prosecuting attorney and the trial judge). The defendant in ***Jorgensen*** showed up drunk at a sentencing hearing on a prior conviction. He was arrested for bail jumping and operating while intoxicated, and the case was tried to a jury. At the jury trial, both the trial court and the prosecutor were present at the earlier sentencing hearing where the violation occurred (so neither should have been involved in prosecuting and hearing the case at all). Both made comments to the jury about what they previously saw and surmised, without taking the stand. The supreme court noted the potential ethical concerns, as well as the Confrontation Clause problems, caused by this set of events. The testimony of these "witnesses" was subjected to no adversarial testing in any form. The "testimony" was in as formal a setting as it gets—a courtroom. The error in that case was without any doubt "fundamental, obvious and substantial." The trial judge charged with catching the error instead participated in it. There was no possibility that the failure to object could have been based on a strategic choice. I am comfortable that ***Jorgensen*** does not dictate a finding of plain error in this case,

where the substitution of Cahill for Kadamian could potentially have been viewed as a favorable development for Nelson.

¶71 That is not to say that there can never be situations involving the failure to object to hearsay testimony by a SANE nurse where the record forecloses the possibility that the failure was strategic or reasonable, thereby allowing for the possibility of plain error. A case where a SANE nurse testifies as to what the victim told him or her, thereby depriving the defendant in a sexual assault case of his or her fundamental right to confront his or her accuser, might be an example. *Cf. **Virgil v. State***, 84 Wis. 2d 166, 184-93, 267 N.W.2d 852 (pre-***Crawford*** case where "the inexplicable failure of defense counsel to object to … clearly inadmissible" hearsay testimony by co-participant, implicating defendant as party to a crime in the victim's murder and robbery, constituted plain error). Such testimony may or may not be deemed testimonial—meaning the objection may or may not be sustained—but it is hard to imagine a *strategic* reason not to object to such testimony.

¶72 This is not that type of situation. As discussed above, there most certainly could have been a reasoned decision not to object to Cahill's surrogacy for Kadamian, but because Nelson has chosen not to pursue relief under the theory that would allow inquiry into that point, we have no way of knowing if that is the case. For important policy reasons, we should not entertain claims of plain error where the alleged error may, in fact, have stemmed from a reasonable and deliberate choice by defense counsel. Instead, any claim for relief should fall within the more factually developed confines of an ineffectiveness claim.

No.   2019AP194-CR(D)

¶73   REILLY, P.J. (*dissenting*).    I respectfully dissent as Dr. Rita Kadamian performed a "Sexual Abuse Evaluation" for "Child Advocacy and Protection Services" as part of a police investigation of Thomas Nelson for the primary purpose of collecting evidence.  Kadamian's statements are testimonial, and as Nelson was given no opportunity to cross-examine Kadamian, Nelson's Sixth Amendment right to confrontation was violated.

¶74   The Majority finds that the "primary purpose" of Kadamian's examination of J.T. "was to evaluate her overall health, treat any conditions needing treatment, and recommend a health care plan for J.T. going forward."[1]  Majority, ¶30.  This finding is directly contrary to the facts in the record and the prosecutor's own argument to the jury that J.T.'s "Sexual Abuse Evaluation" by Kadamian was part of a police "investigation[]" and that J.T. "had two … complete strangers insert objects into her most intimate body parts *in order to collect evidence*."  (Emphasis added.)

¶75   The issue before us is whether Kadamian's *statements* (not her report) read in by a surrogate witness at trial violate the Confrontation Clause.  The Majority excuses the violation by arguing that only "minimal" portions of Kadamian's statements were read to the jury.[2]  Majority, ¶¶13, 49.  The "minimal" statements

---

[1]  The Majority's factual conclusion that Kadamian's report is "like reports related to most health examinations" is problematic as the Majority's factual conclusion is not found in the record.  *See* Majority, ¶30.

[2]  The Majority spends eight paragraphs detailing what the jury did not hear.  Majority, ¶¶13-19, 49.

that the jury did hear went directly to elements the State needed to prove: "use or threat of force or violence" and that J.T. "did not consent to the sexual intercourse." *See* WIS JI—CRIMINAL 1208.

¶76 The State needed Kadamian's "minimal" statements as Gillian Lackey did not offer an opinion on use of force/violence and did not rule out a consensual act.[3] Lackey testified that while she observed J.T.'s injuries, she did not "personally … know how they got there," and it was possible they "could have been part of a consensual action as opposed to a[] [non]consensual action." Given this testimony, the State needed Kadamian's statements that J.T. suffered "blunt force penetrating trauma" to an "acute" level and her opinion that J.T.'s internal injury "supports" sexual assault. Kadamian provided the necessary evidence that was lacking from Lackey's testimony.[4]

¶77 The Majority discounts the importance of Kadamian's statements, but the Majority did not prosecute this case—the State did. The State, via the police, "requested" as part of its investigation of Nelson that Kadamian conduct a second "Sexual Abuse Evaluation," and, as the State told the jury, Kadamian "collect[ed] evidence" from J.T. The fact that Kadamian's evidence came in the form of expert opinion testimony based upon her physical examination of J.T. does not mean Kadamian's statements are not "testimonial" under the Confrontation Clause. The State thought Kadamian's testimony important enough that it brought in a surrogate

---

[3] Lackey was also subject to attack given her lack of credentials. Lackey admitted that she was not certified as a sexual assault nurse examiner (SANE) as "[y]ou have to be a [SANE] for two years in order to sit for board exams to become certified."

[4] The Majority argues that "the record gives no indication that Kadamian … [was] ever instructed [as a SANE] by DOJ or received training related to evidence collection." Majority, ¶43. We do not know that information because Kadamian did not testify. What we do know is that Kadamian is a sexual abuse examiner based on the State's request that she perform a "Sexual Abuse Evaluation" and that they asked her to "collect evidence" as part of her evaluation.

2

witness to get Kadamian's testimony before the jury and highlighted her testimony in both opening statements and closing arguments. Kadamian's testimony was not "minimal" to the State—it was vital.

*Confrontation Clause*

¶78     An out-of-court statement must be "testimonial" in order for a violation of the Sixth Amendment Confrontation Clause to occur. ***State v. Mattox***, 2017 WI 9, ¶24, 373 Wis. 2d 122, 890 N.W.2d 256. The Majority guarantees the "non-testimonial" answer by finding that Kadamian's "primary purpose" in seeing J.T. was to perform an "overall health" examination. Majority, ¶30. By objectively applying the facts in the record, however, it is clear that the "primary purpose" of Kadamian's "Sexual Abuse Evaluation" was a police-directed investigation to collect and gather evidence for the prosecution of Nelson.

¶79     The United States Supreme Court has "labored to flesh out what it means for a statement to be 'testimonial'" since ***Crawford v. Washington***, 541 U.S. 36 (2004), and its progeny. ***Ohio v. Clark***, 576 U.S. 237, 244 (2015). In ***Davis v. Washington***, 547 U.S. 813, 822 (2006), the Court adopted the "primary purpose" test which classified nontestimonial versus testimonial statements as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

3

In *Clark*, the Court fleshed out the parameters of the primary purpose test, observing that an "ongoing emergency" as discussed in *Davis* was not the only factor and the court "must consider 'all of the relevant circumstances.'" *Clark*, 576 U.S. at 244.

¶80    Our supreme court recently addressed the "primary purpose" test in *Mattox*.[5]  The court explained, "the dispositive 'question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony.'" *Mattox*, 373 Wis. 2d 122, ¶32 (alterations in original) (quoting *Clark*, 576 U.S. at 245). "The primary purpose test decides whether the declarant is acting as a witness against the defendant, by considering whether the primary purpose of the out-of-court statement 'was to gather evidence for [the defendant's] prosecution.'" *Id.* (alteration in original; citations omitted).

¶81    The *Mattox* court considered the following factors, from *Clark*, to determine whether a statement is testimonial:  "(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant;

---

[5] In *State v. Mattox*, 2017 WI 9, ¶¶1, 15, 373 Wis. 2d 122, 890 N.W.2d 256, Mattox argued that the admission of a toxicology report through the testimony of the medical examiner, who did not author the report, violated his right to confrontation.  The *Mattox* court disagreed, finding that the primary purpose of the toxicology report "was to provide information to the medical examiner as part of the autopsy protocol, not to establish certain toxicology levels in order to prove an element of a criminal charge." *Id.*, ¶33.  The court reasoned that

> no charges were pending or contemplated against Mattox at the time the medical examiner requested the toxicology report. Because the toxicology report was not intended to substitute for testimony in a criminal prosecution, the report's primary purpose very clearly is not testimonial.

*Id.*

and (4) the context in which the statement was given." ***Mattox***, 373 Wis. 2d 122, ¶32 (footnote omitted) (citing ***Clark***, 576 U.S. at 244-49). In general, the court explained, "[a] formal out-of-court statement is considered more likely to be testimonial, and an informal one is considered less likely to be testimonial." ***Id.***, ¶34. ***Mattox*** concluded that the toxicology report at issue "was not prepared for or given to law enforcement, making it *much less likely* to be testimonial." ***Id.*** The court also noted that the declarant in ***Mattox*** created the report at the request of the medical examiner, not the police. ***Id.***, ¶35. The findings in the toxicology report were generated to help the medical examiner[6] determine cause of death, "not to help the police produce evidence for a criminal prosecution." ***Id.***

¶82 Applying this methodology, Kadamian's statements are testimonial. First, there was no "ongoing emergency" as Kadamian conducted her "Sexual Abuse Evaluation" in a formal setting at "Child Advocacy and Protection Services" eleven days after the event. Kadamian's report of the evaluation was requested by police, given to police, and is akin to the battery affidavit in ***Davis***. *See **Davis***, 547 U.S. at 829-32. Examining the "context" in which Kadamian's statements were given also reflects their testimonial nature. Kadamian performed the "Sexual Abuse Evaluation" *at the request of* police, unlike ***Mattox*** where the toxicology report was prepared at the request of the medical examiner. *See **Mattox***, 373 Wis. 2d 122, ¶¶10, 34. ***Mattox*** is clear that where the statement is prepared for law enforcement and given to law enforcement, then the factors weigh heavily in favor of a finding that the statement is testimonial. *See **id.***, ¶¶34-35. The "primary purpose" of Kadamian's "Sexual Abuse Evaluation" was to gather and collect evidence for the

---

[6] The State in ***Mattox*** asked the court to declare all autopsy reports to be nontestimonial evidence, which our supreme court declined, noting that the medical examiner did testify against Mattox, eliminating any confrontation argument with respect to the autopsy report itself. ***Mattox***, 373 Wis. 2d 122, ¶¶38-40.

prosecution of Nelson. Kadamian was a conduit of police by virtue of her statements being made at their request to collect evidence against Nelson and also related to past events/findings/conclusions for use in Nelson's criminal prosecution: "The contusion is acute and supports [J.T.'s] disclosure of sexual assault." *See id.*, ¶¶32, 34; *see also **Davis***, 547 U.S. at 822. Kadamian's statements are testimonial.

*Plain Error Doctrine*

¶83 "Plain error is 'error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.'" ***State v. Jorgensen***, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77 (quoting ***State v. Sonnenberg***, 117 Wis. 2d 159, 177, 344 N.W.2d 95 (1984)). The unobjected-to error must be "obvious and substantial." *Id.* (citation omitted). "[T]he existence of plain error will turn on the facts of the particular case" as "[t]he quantum of evidence properly admitted and the seriousness of the error involved are particularly important." *Id.*, ¶22 (citations omitted). "Erroneously admitted evidence may tip the scales in favor of reversal in a close case, even though the same evidence would be harmless in the context of a case demonstrating overwhelming evidence of guilt." *Id.* (citation omitted). "Thus, no bright-line rule exists to determine automatically when reversal is warranted." *Id.*

¶84 Our supreme court's decision in ***Jorgensen*** is on point. In ***Jorgensen***, defense counsel did not object to testimonial evidence that was offered to the jury by the judge and prosecutor from a transcript of an earlier court hearing. *Id.*, ¶¶29, 34. Our supreme court concluded "that the unobjected to errors of the judge and the prosecutor" were "fundamental, obvious, and substantial" and that the state had failed to prove that the errors were harmless and, therefore, constituted plain error:

> The opportunity to question one's accusers is central to our
> adversarial system. Without confrontation, potential errors,

> mistakes of fact, and ambiguities are neither examined nor tested by opposing counsel. *Since these observations likely helped to establish elements of the crimes charged, these were not trivial comments by the circuit court.*

*Id.*, ¶¶36, 54 (emphasis added).

¶85 If an error is fundamental, obvious, and substantial, then the burden shifts to the State to establish harmless error. *Id.*, ¶23. The State must prove "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* (citation omitted). We are to consider the following factors to determine whether the error was harmless:

> (1) the frequency of the error; (2) the importance of the erroneously admitted evidence; (3) the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; (4) whether the erroneously admitted evidence duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case.

*Id.* If the State fails to meet its burden "beyond a reasonable doubt," then we may conclude that the errors constitute plain error. *Id.*; *see also* ***State v. Deadwiller***, 2013 WI 75, ¶41, 350 Wis. 2d 138, 834 N.W.2d 362.

¶86 The Majority, in addressing plain error (and harmless error thereafter) states, "it cannot reasonably be argued that it was clear/obvious that the *primary* purpose of Kadamian's report was 'to gather evidence for' or 'substitute for testimony in' the prosecution of Nelson." Majority, ¶48. All I can do in dissent is point to the facts in the record. The police both requested and received Kadamian's "Sexual Abuse Evaluation." The prosecutor told the jury that Kadamian conducted an "investigation[]" and that Kadamian "collect[ed] evidence" for the State. The facts are clear to the police, prosecutor, jury, and myself that Kadamian was

collecting evidence for and at the direction of the police as part of an investigation for the prosecution of Nelson.

¶87 As in *Jorgensen*, the confrontation violation in this case is a fundamental, obvious, and substantial error, and the State failed in its burden to show "beyond a reasonable doubt" that the error was harmless. *See Jorgensen*, 310 Wis. 2d 138, ¶23. Addressing the aforementioned seven factors, the confrontation violation was complete throughout the testimony of Michael Cahill, and Kadamian's statements played a prominent role in the State's opening statements and closing argument. Kadamian's statements addressed the criminal element of "use of force" through her statement that there was evidence of "blunt force penetrating trauma." Kadamian's statements countered Lackey's "difficult[y]" in determining "what exactly [the injury] was" and that it was possible J.T.'s injury "could have been part of a consensual action as opposed to a[] [non]consensual action." Kadamian's investigation via her examination of J.T. led to her opinion that J.T.'s injury "supports" her "disclosure of sexual assault." Nelson's defense and the State's case keyed in on the elemental heart of Kadamian's statements—Nelson saying rough consensual sex and J.T. saying nonconsensual sex by use of force. The State's case was dependent upon proof of "force" and nonconsent, and Kadamian's statements provided both.

¶88 The State has not shown "beyond a reasonable doubt" that a rational jury would have found Nelson guilty absent the errors. *See id.*, ¶23. Kadamian was not subjected to cross-examination, and Nelson was convicted without constitutional guarantees due to him under the Sixth Amendment. The jury heard inadmissible, prejudicial evidence that helped establish elements of the crimes charged, which violated Nelson's right to confrontation and likely affected the

jury's verdict. Admission of Kadamian's statements was plain error and was not harmless. I respectfully dissent and would reverse and remand for a new trial.